IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BERNICE HOOPER, *o/b/o* L.W., | ) ) ) | CASE NO.  1:14-CV-1726 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | MAGISTRATE JUDGE KENNETH S. McHARGH |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 14).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security  (the "Commissioner") denying Bernice Hooper's ("Plaintiff") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq*., on behalf of L.W., is supported by substantial evidence and therefore, conclusive.

For the reasons set forth below, the undersigned AFFIRMS the Commissioner's decision.

## I.    INTRODUCTION & PROCEDURAL HISTORY

On August 17, 2011, Plaintiff filed an application for Supplemental Security Income benefits on behalf of L.W. (Tr. 317-23).  Plaintiff alleged L.W. became disabled on March 29, 2007, due to suffering from lead poisoning, post-traumatic stress disorder ("PTSD"), headaches, and nose bleeds. (Tr. 317, 341).  The Social Security Administration denied the application initially and upon reconsideration. (Tr. 182-84, 188-94).  Thereafter, Plaintiff was granted a hearing before an administrative law judge ("ALJ") to contest the denial.  (Tr. 195).

On May 17, 2013, ALJ Eric Westley convened a hearing to evaluate the application. (Tr. 120-52).  Along with counsel, Plaintiff and L.W. appeared before the ALJ. (*Id*.).  Medical expert

1

("ME"), Cheryl Morrow-White, also appeared and testified. (*Id.*). On May 23, 2013, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 98-112).

Subsequently, Plaintiff sought review of the ALJ's decision from the Appeals Council. (Tr. 94). The council denied Plaintiff's request, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

## II. EVIDENCE

### A. Personal Background Information

L.W. was born on January 30, 2003, and was 10-years-old and in the fourth grade at the time the ALJ issued his opinion. (Tr. 126, 317). Accordingly, L.W. was considered a "school-age child" for social security purposes. *See* 20 C.F.R. 416.926a(g)(2)(iv)-(v).

### B. Medical and Educational Evidence

On May 3, 2011, L.W. was evaluated in the Pediatric Emergency Department of University Hospitals for suspected sexual abuse by her 17-year-old male cousin. (Tr. 465-85). A physical examination revealed no abnormalities and L.W. was referred for counseling. (Tr. 475).

On May 5, 2011, L.W. underwent a mental health assessment at Beech Brook counseling facility. (Tr. 489-506, 511-15). Plaintiff described the incident that occurred between L.W. and her cousin and stated that a similar incident occurred two years earlier. (Tr. 491). Plaintiff indicated that L.W. became distressed when separated from her, had feelings of fear related to her cousin, was detached and highly reactive, and had been lying. (Tr. 500). Plaintiff also reported that L.W. was bullied at school and had a history of poor self-esteem. On the "Ohio Scales," L.W.'s responses endorsed fits of anger, too much energy, worrying, sadness, depression, and nightmares. Findings from a mental status examination of L.W. were

unremarkable, aside from an anxious or nervous mood, soft speech, and psychomotor agitation. (Tr. 497-98). There were also reports of difficulty sleeping and withdrawal. (Tr. 497). L.W. was diagnosed with PTSD and assigned a Global Assessment of Functioning ("GAF") score of 60, representing moderate symptoms or moderate difficulty in social or school functioning. (*Id.*).

In October 2011, Jeannie O'Neill, L.W.'s third grade teacher, completed a questionnaire concerning L.W.'s overall functioning. (Tr. 365-72). She had been teaching L.W. for two months and worked with her five days per week for approximately six hours each day. (Tr. 365). Ms. O'Neill opined that L.W. did not have any problems with her ability to care for herself and her functioning in this regard was age-appropriate. (Tr. 370). For example, Ms. O'Neill declined to find that L.W. had problems handling frustration appropriately, being patient, caring for her physical needs, appropriately asserting emotional needs, and responding appropriately to changes in her mood. (*Id.*). Ms. O'Neill, however, identified a number of issues with regard to L.W.'s ability to acquire and use information, attend to and complete tasks, and interact and relate with others. (Tr. 366-68).

On November 8, 2011, Jason Spivey, M.D., performed an initial psychiatric evaluation of L.W. (Tr. 552-57). Plaintiff reported that L.W. suffered from ADHD. (Tr. 552). She further explained that L.W. had problems with impulsivity and inattention in the classroom, poor behavior at home, and exhibited verbal disrespect and physical violence toward adults and peers. Although L.W. denied any feelings of depression, the child stated that she worried about being hurt and had difficulty sleeping with a mild fear of the dark. L.W. became tearful upon approaching the topic of her past trauma. (*Id.*).

Dr. Spivey noted that in school Plaintiff had difficulty playing with peers, talked out of turn in class, and received detention often. (Tr. 554). The doctor also indicated that L.W. liked

3

to sing, paint, play catch, play video games, cheerlead, and dance. (*Id.*).  Based on a mental status examination, Dr. Spivey found that L.W. was well groomed, had avoidant eye contact, had clear speech, had no reported self-abuse or aggression, displayed a logical thought process, had a euthymic mood and full affect, and was cooperative though withdrawn. (Tr. 555).  Dr. Spivey diagnosed anxiety disorder and ADHD. (Tr. 556).  He believed L.W. would benefit from therapy for her trauma and possible pharmacologic intervention for ADHD symptoms. (*Id.*).

On December 8, 2011, psychologist Joseph Konieczny, Ph.D., evaluated L.W. at the state agency's request. (Tr. 540-42).  Plaintiff told Dr. Konieczny that she did not believe there had been any significant residual effects from the incident of sexual abuse, aside from L.W.'s recent trust issues. (Tr. 541).  L.W. reported occasional nightmare flashback episodes.  Dr. Konieczny described L.W. as neatly attired with adequate grooming and hygiene. During the examination, L.W. related pleasantly and easily, was cooperative, responded readily to all questions and tasks posed, her ability to concentrate and attend to tasks was not impaired, and she showed no indications of hyperactivity, restlessness, or inattentiveness.  The doctor, however, noted that the interview was brief and L.W. was not required to participate in any long term tasks or activities. Dr. Konieczny also observed that L.W. showed no indications of mood swings or disturbance, but she reported some distress with regard to her history of sexual abuse. L.W. showed no indications of a diminished tolerance for frustration. (*Id.*).

Dr. Konieczny concluded that L.W. suffered from adjustment disorder with mixed disturbance of emotions and conduct. (Tr. 542).  The doctor opined that L.W. had some residual effects from the sexual abuse, but her symptoms did not appear to rise to the level that would indicate a diagnosis of PTSD. Dr. Konieczny also felt that a diagnosis of ADHD was not appropriate based on a lack of information in L.W.'s treatment history to support it and her

conduct during the evaluation. The doctor found that L.W. had some diminished coping skills and tolerance for frustration that would result in "some difficulties" in the domain of self-care. (*Id.*).

In December 2011, state agency reviewing psychologist Jennifer Swain, Psy.D., and physician Uma Gupta, M.D., conducted a review of the record. (Tr. 159-61). They concluded that L.W. had a medically determinable impairment of an anxiety disorder that resulted in less than a marked limitation in the domain of caring for yourself. (Tr. 160). When evaluating this domain, they noted that Dr. Konieczny had identified some diminished coping skills and tolerance for frustration. (*Id.*). Drs. Swain and Gupta also opined that Plaintiff suffered from less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 159-60).

In January 2012 a Beech Brook counselor reviewed L.W.'s treatment plan. (Tr. 594-604). She had made progress toward all of her counseling goals and objectives. (Tr. 599). At first L.W. was guarded when participating in therapy, but then became more comfortable in sharing her story and gaining insight on her trauma. (Tr. 600). Her nightmares were greatly reduced. It was noted, however, that as L.W.'s PTSD symptoms decreased, her ADHD symptoms became clearer, such as her hyperactive impulsive behaviors, inability to sustain concentration, and difficulties interacting with peers. L.W.'s therapist recommended changing her goals and objectives to address ADHD and anxiety symptoms. (*Id.*).

On March 5, 2012, a school psychologist assessed L.W.'s progress. (Tr. 629-30). Plaintiff reported difficulties with L.W.'s behavior at school, but that L.W. had many strengths. (Tr. 629). L.W. enjoyed helping others, dancing, being artistic and creative, singing, and

5

gymnastics. Her second grade report card indicated she was performing satisfactorily or at grade level in all areas. (*Id.*).

In March 2012 and April 2012, state agency reviewing psychologist Mel Zwissler, Ph.D., and physician Louis Goorey, M.D., conducted a review of the record. (Tr. 171-73). They concluded there had been no significant change in L.W.'s mental or physical status since the agency review in December 2011 and affirmed the prior functional assessment. (*Id.*).

On September 5, 2012, Deborah Brewster, M.D., evaluated L.W. (Tr. 651-56). L.W. was nine-years-old and in the fourth grade. (Tr. 651). Plaintiff reported that L.W. had more anxiety and depression since the summer, and her ability to focus and behavior at school could be better. Over the summer L.W. was afraid to sleep in her room. L.W. enjoyed cheerleading, dancing, singing, and spending time with two friends. (*Id.*).

As part of the evaluation, Dr. Brewster conducted a psychiatric reviewing, recording Plaintiff and L.W.'s responses. (Tr. 651-62). L.W. endorsed sadness two to three days per week and indicated her concentration was on and off. (Tr. 652). Plaintiff stated that L.W. had increased guilt, but no loss of interest. L.W. had racing thoughts when worried and nightmares about sexual abuse. L.W. fidgeted, sometimes talked excessively and interrupted others, had difficulty waiting her turn, argued with adults, and defied rules. (*Id.*). L.W. also became easily frustrated, but not physically aggressive. (Tr. 653). Dr. Brewster noted that L.W. had meaningful daily activities and helped care for her younger brother. (Tr. 654).

During a mental status examination with Dr. Brewster, L.W. was well dressed and groomed, cooperative, made good eye contact, had a happy mood and full affect, her thought process was coherent and logical, her concentration was intact, and she had fair insight and judgment. (Tr. 654-55). L.W. endorsed anxiety about sleeping in her own bed. (Tr. 655).

6

Dr. Brewster diagnosed PTSD, depressive disorder, and ADHD. (Tr. 655).  The doctor opined that L.W. would benefit from Prozac to target PTSD, her mood, and anxiety.  The doctor indicated that in the future, a simulant could help target ADHD, but thought it best to focus on anxiety, which could improve L.W.'s attention and defiant behavior in school. (*Id.*).

On November 5, 2012, L.W. returned to Dr. Brewster. (Tr. 657).  Plaintiff indicated that there had been a "big difference all around," due to Prozac.  L.W.'s teachers reported that she was more focused, she remained on task, was not hyperactive, and was less aggressive. (*Id.*).  L.W. continued to be unable to sleep in her own bed but denied nightmares. (Tr. 658).  Findings from a mental status examination were largely unremarkable, and L.W.'s mood was happy.  Dr. Brewster increased L.W.'s Prozac dosage to target depression and anxiety. (*Id.*).

On November 29, 2012, Beech Brook therapist Darlene Lamb reviewed L.W.'s treatment plan. (Tr. 660-73).  She noted that L.W. continued to struggle with impulsivity, peer relations, and ADHD symptoms. (Tr. 667).  L.W. had made little progress in improving her interactions with peers and adults, decreasing anxiety responses and hyperactive-impulsive behaviors, and improving her ability to sustain attention. (Tr. 668).

During December 2012, Plaintiff again reported to Dr. Brewster that there was much improvement in L.W.'s mood with Prozac and L.W. was less oppositional, though she recently tripped a boy at school. (Tr. 748).  Plaintiff wanted to wait another month before deciding whether to increase L.W.'s Prozac dosage again.  Plaintiff was not giving L.W. Prozac on the weekends, and Dr. Brewster instructed that L.W. should take it daily.  L.W. agreed that she felt less depressed and worried than before the increase in medication.  The child did not like to sleep in her bed; however, she was participating in the talent show at school and was excited about

7

Christmas. (*Id.*).  During a mental status examination L.W.'s mood was excited. (Tr. 749).  Dr. Brewster wrote that they would consider adding a stimulant at L.W.'s next visit. (*Id.*).

In February 2013, Plaintiff reported that she had not given L.W. Prozac on weekends, as she did not realize it was prescribed for daily use. (Tr. 751).  Plaintiff reported that L.W.'s mood was not good in January or February, her grades had dropped, and she had been lying to teachers and arguing with classmates.  Plaintiff was frustrated that L.W.'s school would not place her in special classes and felt a 504 plan was not enough.  L.W. stated she was not able to focus in school.  Even so, L.W.'s mood was "happy" the past two weeks, her appetite and sleep were very good, and she was not having nightmares.  L.W. planned to work with a therapist regarding worries about sleeping in her own bed.  Plaintiff wanted medication to improve L.W.'s focus. (*Id.*).  Plaintiff had failed to bring L.W. to her therapist appointment and agreed to take L.W. twice per month. (Tr. 752).  Dr. Brewster recommended continuing L.W.'s current dosage of Prozac and starting Concerta for ADHD. (Tr. 753).

On March 20, 2013, L.W. attended her first therapy session with Gail Nevels, MSSA, LISW-S, who described L.W. as bright, cheerful, well groomed, and well oriented. (Tr. 754).  Ms. Nevels recommended dance and art therapy for L.W. and parent training for Plaintiff. (*Id.*).  L.W. also treated with Dr. Brewster that day, at which time Plaintiff reported that L.W. had lost interest in somethings, was lying, jumping on her bed, and fighting with her brother. (Tr. 755).  Plaintiff reported better concentration with Concerta. (*Id.*).  Plaintiff wanted to see if therapy was helpful before increasing L.W.'s dosage of Prozac. (Tr. 756).  As a result, Dr. Brewster continued L.W.'s prior course of medication. (Tr. 757).

8

### III. SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on January 30, 2003. Therefore, she was a school-age child on August 17, 2011, the date the application was filed, and is currently a school-age child.

2. The claimant has not engaged in substantial gainful activity since August 17, 2011, the application date.

3. The claimant has the following severe impairments: post-traumatic stress disorder, anxiety, attention deficit hyperactivity disorder, and depressive disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since August 17, 2011, the date the application was filed.

(Tr. 101-11) (internal citations omitted).

### IV. STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the child claimant is working. If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

9

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and,
> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily

10

> mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record. 20 C.F.R. § 416.927. A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id*. The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might

11

accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.,* 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

Plaintiff argues that the ALJ erred by finding that L.W. did not functionally equal a listing. The ALJ determined that L.W. suffered from a marked limitation in only the domain of attending and completing tasks. Plaintiff contends that in addition to a marked limitation in this domain, L.W. also exhibited a marked limited in the domain of caring for yourself, which the ALJ concluded warranted a less than marked limitation. To support her assertion, Plaintiff points to the testimony of ME Dr. Morrow-White. During the administrative hearing, Dr. Morrow-White testified that L.W. was markedly limited in this domain. (Tr. 150-51). According to Plaintiff, the ALJ's reason for discounting the ME's opinion was not substantially supported by the record. At this juncture, Plaintiff does not challenge the ALJ's findings with regard to any other domain.

The domain of caring for yourself considers how well a claimant maintains a healthy emotional and physical state; how she copes with stress and changes in the environment; and whether she takes care of her own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Examples of limited functioning in this domain may include: not dressing or bathing appropriately for one's age; engaging in self-injurious behavior, such as suicidal thoughts or actions, self-inflicted injury, or refusing to take medication; failing to spontaneously pursue enjoyable activities or interests; or a disturbance in eating or sleeping patterns. *Id.* These examples cover a range of ages and developmental periods. In addition, "the regulation cautions that just because a person has the limitations described does not mean the person has an extreme or even a marked impairment." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009) (*citing* 20 C.F.R. § 416.926a(h)(3)). Thus, the fact that a claimant's behaviors may coincide with the examples in the regulations does not require a court to overturn the ALJ's finding. *Id.*

During the administrative hearing, Dr. Morrow-White opined that L.W. would have a marked limitation in the domain of caring for herself because L.W. had been diagnosed with depressive disorder and anxiety. (Tr. 150). Dr. Morrow-White acknowledged that a November 2012 treatment note with Dr. Brewster may conflict with her opinion. The treatment record indicated that L.W. was much improved with Prozac. Dr. Morrow-White, however, maintained that L.W. was markedly limited in this domain because she had not seen any records after Dr. Brewster's November 2012 report that indicated L.W.'s condition improved. (*Id.*).

The ALJ is to assess the opinions of state agency medical experts as they would opinion evidence from other medical sources. 20 C.F.R. § 416.927(e)(2)(iii). The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law

13

judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(e)(2)(ii). When weighing the opinions of state agency physicians, the ALJ should consider the factors set forth in the regulations, including the supportability and consistency of the opinions and the specialization of the physician. 20 C.F.R. § 416.927(c).

Here, the ALJ evaluated Dr. Morrow-White's opinion and adopted the doctor's findings, aside from the conclusion that Plaintiff exhibited marked limitations in the domain of caring for yourself. (Tr. 110). The ALJ did not concur with the ME in this regard because, contrary to the ME's testimony, the record showed that L.W. improved with medication. (*Id.*).

The ALJ's analysis is supported by substantial evidence. As both the ME and the ALJ highlight, after L.W. began taking Prozac her mood improved. During the November 2012 treatment session after L.W. initiated Prozac, L.W. reported that she was happy, denied worries, and denied having nightmares. (Tr. 110, 657). Although the ME indicated that she found no further evidence reflecting an improvement in L.W.'s depression and anxiety after November 2012, the record, as the ALJ indicated, continues to show progress. For example, in December 2012, Plaintiff again reported to Dr. Brewster that L.W.'s mood was much improved with Prozac. (Tr. 748). L.W.'s mood was excited during the examination and she indicated that she felt less depressed and worried as a result of the medication. (Tr. 749). Despite Dr. Brewster recommending an increase in Prozac in February 2013, which Plaintiff did not want to implement at that time, the child's mood had been happy, her appetite and sleep were good, and she was no longer having nightmares. (Tr. 751). When treating with Ms. Nevels and Dr.

14

Brewster on March 20, 2013, Plaintiff reported that L.W. had lost interest in some things, but L.W. nevertheless presented as bright, cheerful, and well groomed. (Tr. 754). Accordingly, the ALJ provided reasonable grounds explaining why he did not adopt Dr. Morrow-White's marked limitation.

Aside from providing reason to undermine the accuracy of Dr. Morrow-White's opinion, the ALJ pointed to additional evidence showing that any limitations L.W. exhibited in caring for herself did not rise to the level of a marked limitation. For instance, the ALJ cited to a report from Plaintiff's third grade teacher, Ms. O'Neill, which identified no problems with L.W.'s ability to care for herself. (Tr. 110, 370). Dr. Konieczny opined that Plaintiff merely had "some difficulties" due to diminished coping skills and tolerance for frustration. (Tr. 110, 542). It was generally noted that L.W. liked to engage in activities like dance and enjoyed being artistic and creative. (Tr. 110, 629).

Importantly, even if the evidence cited by Plaintiff were sufficient to demonstrate that L.W.'s impairments satisfied the functional equivalency criteria, the relevant question is not whether there is evidence to support a ruling different than that reached by the ALJ. The undersigned must determine whether the substantial evidence in the record supports the ALJ's decision. *Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)*. If such support exists, the undersigned must affirm the ALJ's determination. *Id.*

Although L.W. had ongoing issues, substantial evidence supports the ALJ's finding that L.W. has less than marked limitations in her ability to care for herself. Additionally, much of the evidence Plaintiff highlights is relevant to domains other than caring for yourself. These domains include attending and completing tasks or interacting with others. For instance, Plaintiff cites to L.W.'s hyperactivity, her ability to sustain attention, and difficulties interacting

with peers and adults.  Such evidence fails to undermine the ALJ's ultimate finding with regard to the domain at issue.  A review of the ALJ's opinion indicates that he accounted for these issues in the appropriate domains.

Plaintiff also asserts that the ALJ's discussion of evidence related to caring for yourself terminated with the November 2012 treatment noted from Dr. Brewster and failed to account for evidence that developed thereafter, resulting in a less than complete review of the record.  It is well established that for an ALJ's decision to stand, an ALJ need not discuss each and every piece of evidence in the record. *See, e.g.*, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Thus, the ALJ's failure to expressly discuss treatment records does not necessarily constitute reversible error.  Plaintiff does not provide evidence suggesting that the ALJ failed in his duty to conduct a thorough review of the record.  The ALJ's opinion indicates that he considered evidence arising after November 2012, though he did not discuss all of this evidence in his opinion. (*See, e.g.*, Tr. 105, 107).  Accordingly, Plaintiff's argument is not well taken.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh<br>
Kenneth S. McHargh<br>
United States Magistrate Judge

Date:  August 27, 2015.